[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10069
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cv-03017-SCJ

BRYANT DAVIS,

Plaintiff - Appellant,

versus

DANIEL LANG,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 30, 2017)

Before HULL, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

In this civil appeal involving only a malicious prosecution claim under Georgia law, plaintiff Bryant Davis ("Plaintiff") appeals the district court's order granting summary judgment to defendant Daniel Lang on the basis of official immunity. After careful review, we affirm.

## I. BACKGROUND

This appeal involves whether Plaintiff has created a jury issue on his claim that defendant Daniel Lang acted with "actual malice" when he obtained an arrest warrant for Plaintiff on the misdemeanor charge of theft by deception. We outline the facts giving rise to the warrants.

### A. Rivers Refrigerator Repair

Starting in 2000, Plaintiff operated an appliance repair service under the name Davis Appliance Service. In 2010, because his own business was slow, Plaintiff connected with another repairman named Jonathan Davis ("Jonathan"), who is of no relation to Plaintiff. Plaintiff agreed to work part time for Jonathan's appliance repair company, ARC Appliance. Plaintiff worked as a subcontractor for ARC Appliance, with Plaintiff keeping forty percent of the profits from his work and Jonathan keeping the remaining sixty percent.

In early January 2011, Jonathan received a call from Charlotte Rivers, who requested repair on a Sub-Zero refrigerator located at her home in Rockdale County, Georgia. Jonathan had no experience with this type of refrigerator but

2

wanted to learn about them, so he asked Plaintiff to take the job and planned to accompany him.

On January 4, 2011, Plaintiff and Jonathan went to look at Rivers's refrigerator. Rivers was not at home, but her cousin, Beverly Harrison, let Plaintiff and Jonathan into the house. Plaintiff determined that there was an issue with the refrigerator's compressor, called Rivers, and proposed replacing the filter dryer. Rivers agreed. Plaintiff did not have the necessary parts or tools with him to make the repair and planned to return the next day. Harrison paid Jonathan $286.

On January 5, Plaintiff returned to Rivers's home without Jonathan, and Rivers was there. Plaintiff replaced the refrigerator filter dryer. The refrigerator was working properly, and Plaintiff asked Rivers to monitor it over the next week. Plaintiff did not take any payment from Rivers during this visit.

The next day, on January 6, Rivers called Plaintiff and complained that the refrigerator had stopped working. Rivers also tried unsuccessfully to contact Jonathan.

On January 7, Plaintiff went to Rivers's home and determined that the refrigerator's filter dryer had malfunctioned again. Plaintiff suggested replacing the evaporator, but Rivers, who was upset about not being able to communicate with Jonathan, would not agree to any further repairs. Plaintiff called Jonathan from his own phone and let Rivers speak to Jonathan directly. After speaking to

3

Jonathan, Rivers asked Plaintiff to leave, which he did without making any repairs or taking any payment from Rivers.

That same day, after leaving Rivers's home, Plaintiff called Jonathan and suggested that he give Rivers a refund. Jonathan told Plaintiff that he no longer had the money Rivers paid him, did not have insurance, and was concerned that Rivers might sue him. Upon learning that Jonathan had no insurance, Plaintiff immediately quit working for Jonathan and ARC Appliance.

In March 2011, Rivers contacted another appliance repair company, BSH Home Appliance ("BSH"), to repair her refrigerator. A BSH repairman named Travis Stephens looked at Rivers's refrigerator. In the invoice from this service call (the "BSH Invoice"), Stephens summarized his findings as follows: (1) "[f]ilter dryer was [r]esoldered but not exchanged," (2) "[c]ompressor oil . . . underneath the [c]ompressor," (3) "[c]ompressor had been hard wired with a 1/3 horse headstart [and] the system is in a constant 23 inch [vacuum], suggesting that the    . . . system is [f]ully [r]estricted," (4) "the capillary tube has been [r]esoldered onto the evaporator," (5) "[third] party servicer's [receipt] indicated that they charged the system with 9 [ounces] of [coolant] when the system only [r]equires 7.125 [ounces], and (6) "[u]nit [c]annot [b]e [r]epaired."

**B.    Rivers's Criminal Complaint**

On May 31, 2012, in response to a call from Rivers, Daniel Suwinski, an officer with the Rockdale County Sheriff's Office, met with Rivers at her home and took her initial statement.  Rivers told Officer Suwinski that she paid Jonathan and Plaintiff to repair her refrigerator, but that they not only failed to repair the refrigerator, but also damaged it beyond repair.  Rivers also told Officer Suwinski that she saw a news report indicating that Jonathan had defrauded other customers and had outstanding warrants in Georgia.  In his incident report, Officer Suwinski wrote that "Mr. Bryant Davis uses the company name of Fox appliances" and "Mr. Jonathan Davis uses the company name of ARC appliances."

In a separate written statement, Rivers recounted how she paid Jonathan and Plaintiff to repair her refrigerator, but the refrigerator was never repaired.  Rivers stated that she made two payments to Jonathan in the amounts of $484.50 and $834.20 and two payments to Plaintiff in the amounts of $206.41 and $64.99.  Rivers stated that she had all receipts for these payments, which totaled $1,590.10.  Rivers also reported that Plaintiff and/or Jonathan did business under the names Fox Appliance and/or ARC Appliance.

After Officer Suwinski took Rivers's initial oral and written statements, defendant Daniel Lang, now a Sergeant with the Rockdale County Sheriff's Office, investigated Rivers's complaint.  On July 7, 2012, Rivers came to Sergeant Lang's

5

office and gave him these key documents:        (1) receipts showing that she paid $484.50 to Jonathan via check, $64.99 to Fox Appliance Parts via check, $206.41 to Fox Appliance Parts via debit card, and $834.20 to ARC Appliance via credit card; and (2) a copy of the BSH Invoice, which detailed the problems with Plaintiff's repair work, indicated that "whoever worked on [Rivers's refrigerator] didn't know what they were doing," and concluded that Rivers's refrigerator could not be repaired. In short, according to Rivers, she paid $1,509.10 in total to Jonathan and Plaintiff, but they had not repaired her refrigerator and in fact had damaged it beyond repair.

On July 12, 2012, defendant Sergeant Lang searched the internet for information about Plaintiff and Jonathan and found customer reviews. According to Sergeant Lang, in these online reviews, former customers claimed that Plaintiff and Jonathan took money from them without completing the requested repair services. The online reviews include comments claiming that Jonathan is a "con artist" who "needs to be stopped."

In his incident report, Sergeant Lang noted that "[t]here [were] warrants on the two brothers from other jurisdictions," a news special had exposed "the two brothers['] scams," and "it was apparent that these men scam people by taking their money and either mess[ing] up the appliance or just not work[ing] on it and tak[ing] the money." Sergeant Lang assumed that the two men were brothers

6

because they shared a last name (Davis) and because Rivers described them as such.

Officer Suwinski reported that he was unable to reach either Plaintiff or Jonathan via telephone.  Sergeant Lang also was unable to locate either Plaintiff or Jonathan.

On July 13, 2012, Sergeant Lang obtained warrants for Plaintiff and Jonathan.  Two separate arrest warrants accused Plaintiff of committing:  (1) theft by deception, a misdemeanor, in violation of O.C.G.A § 16-8-3; and (2) second degree criminal damage to property, a felony, in violation of O.C.G.A. § 16-7-23.  In the theft-by-deception warrant, Sergeant Lang noted that Plaintiff took "several payments from [Rivers] in the amount[s] of $206.41 and $64.99 for repairs that were never performed on her refrigerator."

By the time Sergeant Lang obtained these warrants, Plaintiff had moved to Paducah, Kentucky.  Plaintiff heard nothing about the 2011 issues with Rivers's refrigerator or the 2012 warrants until his eventual arrest in 2015.

## C.    Arrest and Criminal Proceedings

On February 12, 2015, Kentucky police stopped Plaintiff for speeding. Because of the arrest warrant in Georgia, Kentucky police took Plaintiff into custody and held him in jail until April 5, 2015, when he was transferred to the Rockdale County Jail in Georgia.  Plaintiff's bond was set for $20,000—$15,000

7

for the criminal damage to property charge and $5,000 for the theft by deception charge.

On April 22, 2015, Plaintiff and his counsel appeared in the Magistrate Court of Rockdale County for a committal hearing. Sergeant Lang was the only person to testify at this hearing.

During the hearing, Sergeant Lang accurately testified that Rivers hired Jonathan and Plaintiff to repair her refrigerator and paid them a substantial amount of money but the refrigerator was never repaired. Sergeant Lang also accurately testified that he received the BSH Invoice, which detailed the mistakes that Plaintiff made and concluded that the refrigerator could not be repaired.

Sergeant Lang made some mistakes in his testimony, however, stating that he discovered online reviews and news reports indicating that other customers had service issues with Jonathan and Plaintiff and outstanding warrants for Plaintiff. But it was later revealed that these reports related only to Jonathan. Sergeant Lang further testified that he spoke on the phone with the BSH repairman, who told him that whoever repaired Rivers's refrigerator made mistakes and billed Rivers for work that was never done and that the refrigerator was damaged beyond repair. But it was later revealed that the BSH repairman died after inspecting the refrigerator but before Lang's reported conversation with him.

At the close of the committal hearing, the State voluntarily dismissed the felony charge for criminal damage to property for insufficient evidence and lack of intent.  As to the misdemeanor charge for theft by deception, the Magistrate Court of Rockdale County allowed the prosecution to go forward.

After his cousin posted a cash bond, Plaintiff was released from the Rockdale County Jail on May 22, 2015.  Subsequently, upon a motion by the State, the State Court of Rockdale County entered a nolle prosequi order on the misdemeanor theft-by-deception charge.

**D.    Plaintiff's Civil Complaint and Discovery**

On August 26, 2015, Plaintiff filed a civil complaint against defendant Sergeant Lang in federal district court.  The operative amended complaint asserted two claims:  (1) violation of Plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983 and (2) malicious prosecution under O.C.G.A. § 51-7-40.

During discovery, Sergeant Lang gave deposition testimony in which he explained or clarified several of the statements that he made in the incident report and during the committal hearing.  Sergeant Lang stated that:  (1) he eventually discovered that Jonathan and Plaintiff are not brothers; (2) the news reports he referenced related only to Jonathan, not Plaintiff; (3) all of the negative online reviews referenced Jonathan, not Plaintiff; (4) he did not discover any outstanding warrants for Plaintiff; and (5) though Rivers told him that she made two payments

9

to Plaintiff in the amounts of $206.41 and $64.99, he later learned that she actually paid these amounts to Fox Appliance Parts, which is a parts company in Atlanta. Rivers still maintained, however, in a written declaration dated April 7, 2016, that she made two payments directly to Plaintiff.

In his deposition, Sergeant Lang reiterated that he spoke to BSH repairman Stephens on the phone. BSH's legal representative, however, indicated that Stephens died on May 5, 2012, after he inspected Rivers's refrigerator but before Rivers complained to the Sheriff's Office on May 31, 2012. Sergeant Lang explained that the 2015 committal hearing took place years after he initially investigated Rivers's 2012 complaint, that he had trouble finding the case file, and that he had little time to review the facts recovered during the investigation. Sergeant Lang admitted that, in light of the timing of the 2015 committal hearing, some of his testimony may have been mistaken. Nonetheless, his core testimony about Rivers's complaints and what happened to her refrigerator was correct. Lang was also correct that the BSH repairman had visited Rivers's home and determined that the refrigerator could not be repaired, but that information came from the BSH Invoice, not a telephone call with the BSH repairman.

## E.     Summary Judgment

After discovery, defendant Sergeant Lang filed a motion for summary judgment, which the district court granted. As to Plaintiff's § 1983 claim, the

10

district court determined that Sergeant Lang was entitled to qualified immunity because he had arguable probable cause to charge Plaintiff with both theft by deception and criminal damage to property.  This determination is not at issue on appeal.

As to Plaintiff's state law malicious prosecution claim, the district court determined that defendant Sergeant Lang was entitled to official immunity under Georgia law because there was no evidence of "actual malice," which is required to overcome such immunity.  Plaintiff appeals this ruling.[1]

## II.  DISCUSSION

### A.    Official Immunity and Actual Malice

Under Georgia's doctrine of official immunity, state public officials generally cannot be held personally liable for discretionary acts performed within the scope of their official authority.  Cameron v. Lang, 549 S.E.2d 341, 344 (Ga. 2001).   Public officials do not enjoy official immunity under Georgia law, however, when "they act with actual malice or with actual intent to cause injury in the performance of their official functions."  Ga. Const. art. I, § 2, ¶ IX(d); Murphy v. Bajjani, 647 S.E.2d 54, 60 (Ga. 2007).

---

[1]We review de novo the district court's grant of summary judgment, considering the evidence and the inferences therefrom in the light most favorable to the nonmoving party. Mendoza v. Sec'y, Dep't of Homeland Sec., 851 F.3d 1348, 1352 (11th Cir. 2017).  Summary judgment is appropriate where the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). There is a genuine dispute where the evidence would allow a reasonable jury to find in favor of the nonmoving party.  Mendoza, 851 F.3d at 1352.

11

The district court determined, and Plaintiff does not dispute, that at all relevant times, Sergeant Lang was performing discretionary acts within the scope of his official authority.  Thus, the issue here is whether the record creates a jury issue as to actual malice.

Under Georgia law, "actual malice," as used in the doctrine of official immunity, is conceptually distinct from the generic form of malice required to state a malicious prosecution claim.  To state a malicious prosecution claim, the plaintiff must show that the defendant acted "maliciously and without any probable cause." O.C.G.A. § 51-7-40; Anderson v. Cobb, 573 S.E.2d 417, 419 (Ga. Ct. App. 2002). For purposes of stating a malicious prosecution claim, malice may be inferred from a "total lack of probable cause."  O.C.G.A. § 51-7-44; see Jones v. Warner, 686 S.E.2d 835, 838 (Ga. Ct. App. 2009) (quoting Arbee v. Collins, 463 S.E.2d 922, 924 (Ga. Ct. App. 1995)) (pertaining to a cause of action for false arrest).

Stating a claim for malicious prosecution, however, is not the same as showing that the defendant acted with "actual malice" for purposes of defeating official immunity.  In Anderson, the Georgia Court of Appeals explained the distinction between this showing of generic malice and the official immunity concept of "actual malice" as follows:

> While [the plaintiff] argues that a jury could infer that [the police officer] acted with malice if it concluded she acted without probable cause, that analysis only applies to the threshold requirements for a tort claim of malicious prosecution . . . . The issue before us, on the

other hand, is not whether [the officer] acted maliciously as defined in OCGA § 51-7-44, but first whether she acted with <u>actual</u> malice that would exempt her from official immunity.

<u>Anderson</u>, 573 S.E.2d at 419.  Lack of probable cause alone will not support a finding of "actual malice."  <u>Id.</u>  Rather, "actual malice" requires more than showing that the defendant police officer lacked probable cause.  <u>Id.</u>

The term "actual malice," as used in the context of official immunity, means "a deliberate intention to do wrong," or "the intent to cause the harm suffered by the plaintiffs."  <u>Murphy</u>, 647 S.E.2d at 60 (quoting <u>Merrow v. Hawkins</u>, 467 S.E.2d 336, 337 (Ga. 1996)).  "Actual malice" does not include "reckless disregard for the rights or safety of others."  <u>Id.</u>  Although "ill will" may contribute to a finding of actual malice, "its presence alone cannot pierce official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal."  <u>Adams v. Hazelwood</u>, 520 S.E.2d 896, 898 (Ga. 1999); <u>see</u> <u>Stephens v. Zimmerman</u>, 774 S.E. 2d 811, 816 (Ga. Ct. App. 2015) (concluding that the defendant police officer did not act with actual malice despite the fact that she "made inconsistent, even possibly untrue, statements"); <u>Marshall v. Browning</u>, 712 S.E.2d 71, 75 (Ga. Ct. App. 2011) ("[W]here an officer's decision to seek warrants might be characterized as 'misguided' there was nevertheless no evidence that the actions were taken with actual malice for purposes of official immunity.").

Under Georgia law, the record may support an inference of actual malice where there is evidence indicating that the police officer arrested the plaintiff despite having clear proof that the plaintiff did not commit the crime for which he was arrested. See City of Atlanta v. Shavers, 756 S.E.2d 204, 206-07 (Ga. Ct. App. 2014), overruled on other grounds by Rivera v. Washington, 784 S.E.2d 775, 780 n.7 (Ga. 2016); Bateast v. Dekalb County, 572 S.E.2d 756, 758 (Ga. Ct. App. 2002).

For example, in Shavers, the defendant police officer arrested the plaintiff for larceny despite having seen a video showing that the plaintiff did not take the goods he was alleged to have stolen. Shavers, 756 S.E.2d at 205-06. The video was clear proof. See id. Similarly, in Bateast, the defendant police officer arrested the plaintiff for providing false information about her identity despite having already verified that the information that the plaintiff provided was valid and accurate. Bateast, 572 S.E.2d at 757. The defendant had verified the information as accurate and thus had clear knowledge and proof that the plaintiff had not provided false information. See id. In both cases, the Georgia Court of Appeals concluded that the police officer was not entitled to summary judgment on the basis of official immunity. Shavers, 756 S.E.2d at 207; Bateast, 572 S.E.2d at 758; see also Lagroon v. Lawson, 759 S.E.2d 878, 883-84 (Ga. Ct. App. 2014) (concluding that officers acted with actual malice where they coerced witnesses

14

into giving false statements or outright fabricated witness statements and then used those statements to knowingly engage in wrongful prosecution).

A reasonable jury also may infer actual malice from evidence showing that the defendant police officer made an arrest for the sole purpose of collecting a civil debt, which is prohibited under Georgia law. Jordan v. Mosely, 487 F.3d 1350, 1357 (11th Cir. 2007). In Jordan, the plaintiff damaged a backhoe, and the defendant officer urged the plaintiff to pay for repairs. Id. at 1353. When the plaintiff refused, the defendant officer obtained and executed a warrant for the plaintiff's arrest and later admitted that he procured the arrest warrant for the purpose of convincing the plaintiff to pay. Id. at 1353, 1357.

With this Georgia law in mind, we turn to Plaintiff's arguments on appeal.

**B.    Probable Cause Existed for the Warrant**

First, Plaintiff contends that the record supports a finding of actual malice because Sergeant Lang obtained an arrest warrant without probable cause for the offense of theft by deception.

We must disagree because Rivers's written statement, along with the BSH Invoice confirming her story that the refrigerator was not repaired, gave Sergeant Lang probable cause for the misdemeanor charge of theft by deception under Georgia law. Specifically, under § 16-8-3, "[a] person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice

15

with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3(a). Section 16-8-3 further provides that a "person deceives if he intentionally . . . [p]romises performance of services which he does not intend to perform or knows will not be performed." Id. § 16-8-3(b)(5).

Further, to prove a misdemeanor violation under § 16-8-3(b)(5), the State must only show that the value of the services Plaintiff actually provided was less than the value obtained from Rivers. See Stratacos v. State, 748 S.E.2d 828, 830-31 (Ga. 2013); see also Kimble v. State, 432 S.E.2d 636, 637-38 (Ga. Ct. App. 1993) (affirming a conviction under § 16-8-3(b)(5) where the defendant took payments under a home construction contract but only partially performed the agreed-to construction).

Rivers asserted, both in her interview with Officer Suwinski and in her written statement, that she paid Plaintiff for services that were never performed. Therefore, Sergeant Lang was presented with a criminal complainant who consistently stated that she paid Plaintiff to fix her refrigerator but that the refrigerator was never repaired. The BSH Invoice, which Sergeant Lang also had, corroborated Rivers's claims. Under these circumstances, Sergeant Lang had probable cause to obtain an arrest warrant for Plaintiff for the misdemeanor offense of theft by deception. We thus reject Plaintiff's lack-of-probable-cause theory.

16

**C.    Mistakes in Investigation and Testimony Did Not Defeat Probable Cause**

Although Sergeant Lang had probable cause, the evidence shows that he did reach some mistaken conclusions during his investigation.  Sergeant Lang was mistaken in his beliefs that Plaintiff and Jonathan were brothers and that Plaintiff and Jonathan were business partners such that complaints about Jonathan on the internet and warrants for Jonathan could be attributed to Plaintiff as well.  Additionally, Sergeant Lang testified inaccurately that he had spoken with BSH repairman Stephens.  Nonetheless, the undisputed fact remains that Sergeant Lang had a copy of the BSH Invoice and that BSH Invoice reported not only that the refrigerator was not repaired, but that it was destroyed beyond repair.

While the content of Sergeant Lang's testimony about BSH's involvement came from the BSH Invoice rather than a telephone call with the BSH repairman Stephens, it remains that Sergeant Lang's testimony—about BSH's involvement and what the BSH repairman Stephens found during his inspection—was supported by the record.  The BSH employee-spokesperson did not provide any information beyond what was already available in the BSH Invoice.  Importantly, Sergeant Lang's mistaken beliefs and inaccurate statement that the BSH information came from a telephone call (as opposed to the BSH Invoice) did not remove or defeat probable cause here.  As outlined above, Rivers's statements,

17

which were corroborated by the BSH Invoice, established probable cause for the misdemeanor offense of theft by deception.

**D.     No Evidence of Actual Malice**

As noted above, even if Sergeant Lang lacked probable cause, that <u>alone</u> does not support an inference of actual malice. <u>Anderson</u>, 573 S.E.2d at 419. Instead, to show actual malice to defeat official immunity, Plaintiff must show that Sergeant Lang acted with deliberate intent to do a wrongful act or to harm Plaintiff. See <u>Murphy</u>, 647 S.E.2d at 60.

Here, there is no evidence that Sergeant Lang intended to commit a wrongful act or deliberately sought to harm Plaintiff. Unlike in <u>Shavers</u> and <u>Bateast</u>, there is no evidence showing that Sergeant Lang obtained an arrest warrant for Plaintiff despite having clear knowledge or clear proof that Plaintiff was innocent of theft by deception. While two of Rivers's payments went to Fox Appliance Parts rather than directly to Plaintiff, Sergeant Lang had ample reason to believe that the payments made to Fox Appliance Parts were tantamount to payments made directly to Plaintiff. Indeed, Rivers stated that she made those payments to Plaintiff.

Furthermore, Sergeant Lang's above-mentioned mistaken beliefs and inaccurate statements do not rise to the level of actual malice. See <u>Stephens</u>, 774 S.E.2d at 816 (concluding that the officer's "inconsistent" or even "possibly

18

untrue" statements "do not show a deliberate intent to commit a wrongful act or to harm [the plaintiff]"). At worst, Sergeant Lang's inaccuracies and mistakes constituted negligent actions during the investigation, which alone cannot sustain a finding of actual malice. See Merrow, 467 S.E.2d at 337-38 (holding that, for purposes of official immunity, actual malice does not include even acts taken with reckless disregard for the rights of others).

Plaintiff also argues that the record supports a finding of actual malice because Sergeant Lang committed the wrongful act of perjury by falsely testifying under oath that he spoke to BSH repairman Stephens on the phone. See O.C.G.A. § 16-10-70(a) ("A person to whom a lawful oath or affirmation has been administered commits the offense of perjury when, in a judicial proceeding, he knowingly and willfully makes a false statement material to the issue or point in question."); see also Marshall, 712 S.E.2d at 74 & n.11 (noting that the lack of actual malice was supported by the absence of any accusations that the officer manufactured evidence or knowingly presented perjured testimony).

Missing from the record here, however, is any evidence showing that Sergeant Lang intentionally gave false testimony in a deliberate effort to act wrongfully or to harm Plaintiff, which is required for a finding of actual malice. In fact, the record indicates that any inaccuracies in Sergeant Lang's testimony were inadvertent.

19

The 2015 committal hearing took place three years after Sergeant Lang's 2012 investigation of Rivers's complaint. Even if the facts to which Sergeant Lang testified did not come from a phone conversation with Stephens, the record establishes that Sergeant Lang learned those same facts from reviewing the BSH Invoice, which was provided to him during the investigation. Thus, rather than evidencing any intentional wrongdoing, the record indicates that Sergeant Lang merely was mistaken about the source from which he derived these BSH-reported facts. Without any evidence suggesting that Sergeant Lang misspoke intentionally to harm Plaintiff, the only reasonable inference is that Sergeant Lang's inaccurate testimony was the result of mistake rather than actual malice.

In any event, Sergeant Lang's testimony that he spoke directly to BSH repairman Stephens was not material to the charges brought against Plaintiff. The relevant facts—that the repair work done on Rivers's refrigerator was inadequate and that the refrigerator was damaged and beyond repair—were available to Sergeant Lang from the BSH Invoice. Whether these facts came from a phone conversation or the BSH Invoice is immaterial to the misdemeanor crime with which Plaintiff was charged. See O.C.G.A. § 16-8-3. Thus, the record does not

support a finding of actual malice based on Sergeant Lang's alleged intention to make false statements under oath.[2]

### E.    Arrest for Collection of a Civil Debt

Plaintiff finally contends that Sergeant Lang arrested him for the wrongful purpose of collecting a civil debt, which supports an inference of actual malice. See Jordan, 487 F.3d at 1357.

Here, however, there is no evidence indicating that Sergeant Lang's motive for obtaining an arrest warrant for Plaintiff was in any way related to recouping the payments Rivers made.  Sergeant Lang never pressured Plaintiff to return money to Rivers or to cover the costs of reversing the damage done to her refrigerator. Unlike the police officer in Jordan, Sergeant Lang gave no indication that he obtained an arrest warrant for Plaintiff because of Plaintiff's refusal to pay Rivers or because he wanted to convince Plaintiff to do so.

Accordingly, we reject Plaintiff's argument that the record supports an inference of actual malice based on Plaintiff's theory of an arrest to collect a civil debt.

---

[2]We also reject Plaintiff's contention that actual malice can be inferred from Sergeant Lang's alleged unreasonable reliance on false or inconsistent statements.  It is true, as Plaintiff notes, that an officer's unreasonable reliance on false statements indicates that the officer lacked probable cause to seek an arrest warrant.  Lagroon, 759 S.E.2d at 885-86; Willis v. Brassell, 469 S.E.2d 733, 739 (Ga. Ct. App. 1996).  But as explained above, Sergeant Lang had probable cause based on his reasonable reliance on Rivers's statements and the facts reported in the BSH Invoice.  And even assuming arguendo that Sergeant Lang lacked probable cause, that alone would not support an inference of actual malice.  Anderson, 573 S.E.2d at 419.

### III.  CONCLUSION

For all of the above reasons, we affirm the district court's order granting summary judgment to defendant Daniel Lang on the basis of official immunity under Georgia law.

**AFFIRMED.**